UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
DIVERSE PARTNERS, LP, and TROY BANK & :
TRUST COMPANY, *individually and on behalf of* :
*all others similarly situated*, :
: 16-CV-9526 (VEC)
Plaintiffs, :
: OPINION AND ORDER
-against- :
:
AGRIBANK, FCB, :
:
Defendant. :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

In this putative class action, Plaintiffs Diverse Partners, LP and Troy Bank & Trust Company have sued Defendant AgriBank, FCB for breach of contract and breach of the implied covenant of good faith and fair dealing. *See* Dkt. 45 (Second Am. Compl.). Plaintiffs allege that Defendant wrongfully redeemed $500,000,000 in subordinate notes (the "Notes") before their stated maturity date, thereby causing Plaintiffs—allegedly beneficial owners of the Notes—to lose substantial interest payments. *See id.* Plaintiffs have moved under Fed. R. Civ. P. 23(a) and 23(b)(3) to certify a plaintiff class of all beneficial owners of the Notes when Defendant redeemed them; to appoint Plaintiffs as the co-representatives of the class; and to appoint Plaintiffs' counsel as class counsel. *See* Dkts. 55-57. Plaintiffs' motions are DENIED.

## DISCUSSION[1]

The Court assumes the parties' familiarity with the facts of this case and directs readers to its opinion and order denying Defendant's motion to dismiss. *See* Dkt. 26. The Court provides additional factual details throughout this discussion where relevant.

---

[1] In a separate, concurrently filed order, the Court has ruled on the parties' requests to file certain documents under seal and/or with redactions. *See* Dkts. 60, 70. Throughout this opinion, the Court references information from documents that were filed under seal but that it has ordered unsealed, with or without redactions.

Pursuant to Rules 23(a) and 23(b)(3), Plaintiffs seek to certify a class "of all persons who beneficially owned Notes when the Redemption occurred," excluding (a) Defendant Agribank, (b) any of Agribank's subsidiaries, (c) current or former officers of Agribank or any of its subsidiaries, and those officers' immediate families, (d) any entity in which Agribank has or had a controlling interest, and (e) the legal representatives, heirs, successors, and assigns of any of these excluded parties. *See* Dkt. 56 (Mem. in Supp. of Class Cert.) at 1-2.

In addition to bearing the burden of satisfying the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—a plaintiff seeking certification of a Rule 23(b)(3) class action must also satisfy Rule 23(b)(3)'s requirements: first, that "the questions of law or fact common to class members predominate over any questions affecting only individual members," and second, that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (internal quotation marks and citations omitted). The plaintiff must satisfy each requirement by a preponderance of the evidence. *Id.* Because the Court finds that Plaintiffs' proposed class fails to satisfy Rule 23(b)(3)'s predominance requirement and that class certification is therefore inappropriate, the Court need not and does not address whether Rule 23(b)(3)'s superiority requirement or Rule 23(a)'s requirements have been satisfied. *See, e.g.*, *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394, 2017 WL 1331288, at *12 (S.D.N.Y. Ap. 4, 2017) (declining to address other class-certification prerequisites when plaintiff failed to carry burden on one).[2]

---

[2] The Second Circuit has also "recognized an implied requirement of ascertainability in Rule 23," which "demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Petrobras*, 862 F.3d at 260 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)). Defendant does not contest, and the Court sees no reason to doubt, that Plaintiffs' proposed class definition satisfies that "modest threshold requirement," *id.* at 269: because the putative class consists of all those having a beneficial ownership in the Notes on a specific date, July 15, 2016, the class has been "defined using objective criteria that establish a membership with definite boundaries"—even though, as the

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (internal quotation marks omitted). Predominance "is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Id.* (internal quotation marks omitted). "This analysis is more qualitative than quantitative," and it "must account for the nature and significance of the material common and individual issues in the case." *Petrobras*, 862 F.3d at 271 (internal quotation marks, citations, and brackets omitted). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.'" *Id.* at 270 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)).

This case presents two common questions susceptible to generalized, class-wide proof: whether Defendant breached the Global Security by redeeming the Notes on July 15, 2016, rather than on their stated maturity date of July 15, 2019, *see* Dkt. 45 (Second Am. Compl.) ¶¶ 178-96, and whether, by the same conduct, it breached the implied covenant of good faith and fair dealing, *see id.* ¶¶ 197-206. Because there is no dispute that all of the Notes were governed by a single Global Security, *see* Dkt. 57 ex. 3 (Global Security); Dkt. 56 (Mem. in Supp. of Class Cert.) at 3, 6; Dkt. 68 (Mem. in Opp. to Class Cert.) at 4 n.3, and because Defendant does not dispute that it redeemed the Notes on July 15, 2016, *see* Dkt. 68 (Mem. in Opp. to Class Cert.) at

---

Court will explain, individual questions regarding "*proof of membership* under [the] given class definition" ultimately predominate over common questions, *id.*

7, the answers to these two questions turn on the Court's interpretation of the Global Security. That interpretation would resolve both questions for the entire putative class.

These two common questions having been identified, the predominance inquiry then turns to whether adjudicating this case requires resolving any individual questions and, if so, whether those individual questions are "more substantial" than the common ones. *Mazzei*, 829 F.3d at 272 (internal quotation marks omitted). Defendant purports to identify a number of individual questions, *see* Dkt. 68 (Mem. in Opp. to Class Cert.) at 14-24, but two of its candidates suffice to defeat certification: (1) the individualized fact-finding necessary to identify the putative class's members, and (2) the individualized inquiry whether any putative class member's acquisition of less than $250,000 in Notes was a material breach of the Global Security and thus excused Defendant's obligations under the Global Security to such class member. Each of these individualized question independently defeats predominance.[3]

Regarding the first of these issues, it is well established that individual questions regarding membership in a putative class may predominate over common questions and therefore preclude class certification under Rule 23(b)(3). In *Mazzei v. Money Store*, 829 F.3d at 272-73, for instance, the Second Circuit affirmed the partial decertification of a class on predominance and typicality grounds where verifying class membership required poring over the unique loan documents each purported class member had signed before taking a mortgage loan from the defendant. In *In re Petrobras Securities*, 862 F.3d at 268, the Circuit reiterated that "classes that require highly individualized determinations of member eligibility" may fail the predominance requirement. Similarly, in *Vogel v. City of New York*, No. 14-CV-9171 (RMB), 2017 WL

---

[3] Because the Court holds that these two issues will each independently predominate over common ones, it need not and does not address the other purportedly individualized questions that Defendant has identified. *See* Dkt. 68 (Mem. in Opp. to Class Cert.) at 17-24.

4712791, at *5-7 (S.D.N.Y. Sept. 19, 2017), this Court refused to certify a class on predominance grounds, noting that if "too much individual inquiry is required to determine whether someone is a member of the class, then a court could find that class issues do not predominate over individual issues," and holding that because "potentially thousands of individualized and elaborate inquiries would be required to identify who [was] part of the class," "'predominance' [was] not satisfied" (citations and internal quotation marks omitted). This Court has reiterated this principle at least twice in the last two years. *See Hunter v. Time Warner Cable Inc.*, No. 15-CV-6445, 2019 WL 3812063, at *9-14, 17 (S.D.N.Y. Aug. 14, 2019) (denying Rule 23(b)(3) class certification because "eligibility for class membership" could not "be reliably determined" on a class-wide basis via plaintiffs' proposed methodology; "significant individualized inquiries would [therefore] be required to determine whether" purported class members "are indeed properly considered members of the proposed class"; and those inquiries would "overshadow[]" any common issues); *Calvo v. N.Y.C.*, No. 14-CV-7246, 2018 WL 1633565, at *7-9 (S.D.N.Y. Apr. 2, 2018) (noting that "[i]f individualized questions as to membership in the proposed class predominate over common questions, class certification is precluded" and denying Rule 23(b)(3) certification where "evaluating whether each [purported class member] actually belongs in the class would be highly fact-intensive for the Court, as well as the parties").

Determining class membership in this case will be a fact-intensive, individualized inquiry that overwhelms common questions. Plaintiffs' proposed class consists of all beneficial owners of the Notes when Defendant redeemed them. *See* Dkt. 56 (Mem. in Supp. of Class Cert.) at 1-2. But even after extensive fact discovery, Plaintiffs themselves have been unable to identify those beneficial owners, and they have failed to offer a "source of generalized proof that can

accomplish the task" reliably, *Hunter*, 2019 WL 3812063, at *10. The difficulty arises from the waterfalling manner in which beneficial ownership of the Notes was distributed. Like the residential-mortgage-backed securities in *Royal Park Investments*, 2017 WL 1331288, at *6, the Notes were "not held directly, in physical form or otherwise, by investors." Rather, like the securities in *Royal Park*, the Notes were beneficially owned and held in "book entry" form by the Depository Trust Company ("DTC"), a "clearing agency." *Royal Park*, 2017 WL 1331288, at *6; *see also* Dkt. 57 (fiscal agency agreement) ¶ 2(a)(ii); 14 (DTC report). DTC held the Notes in the name of a DTC nominee on behalf of various participating banks and brokerage firms. *See* Dkt. 57 (fiscal agency agreement) ¶ 2(a)(ii); 3 (Global Security) at AB00038634. The customers of those participating banks and brokerage firms (or the customers' customers) are, in turn, the ultimate beneficial owners of the Notes. *Royal Park*, 2017 WL 1331288, at *6; *see also* Dkt. 56 (Mem. in Supp. of Class Cert.) at 6-7 (confirming this arrangement). Put differently, an individual holding a beneficial interest in the Notes owned the right to benefit from the Notes but did not hold the Notes themselves. *Brecher*, 806 F.3d at 25-26. Further complicating things, as in *Royal Park*, the Notes were issued under a single CUSIP number rather than under "unique identifiers corresponding to individual investors' ownership interests." *Royal Park*, 2017 WL 1331288, at *6; *see also* Dkt. 57 ex. 3 (Global Security under CUSIP number 00850LAA2).

Determining who beneficially owned the Notes when they were redeemed therefore requires (a) identifying the various participating banks and brokerages that first divvied up the Notes held by DTC; (b) identifying the various clients on whose behalf those participants purchased those Notes; and (c) determining—through contractual documentation, testimony from the participants and the client entities, or some combination thereof—whether those client

entities were, in fact, the beneficial owners of the Notes or whether they purchased them for yet other entities further down the waterfall. This inquiry is a sprawling one. As the bundle of papers appended to Plaintiffs' certification motion indicates, *see* Dkts. 57, 72 (Novod Decls. in Supp. of Class Cert.), beneficial ownership of the Notes flowed in hundreds of directions, first through forty-four participating entities, then down (according to Plaintiffs' estimate) to at least 150 and probably 300 or more beneficial owners. *See* Dkt. 56 (Mem. in Supp. of Class Cert.) at 7, 10. Identifying those beneficial owners also demands individualized proof: verifying that any purported beneficial owner actually held an interest in the Notes—and, even more importantly, confirming that the interest was genuine beneficial ownership rather than yet another tier in the "street name" waterfall—requires scrutinizing a set of banking records and related documents unique to each purported class member. *See, e.g.*, Dkt. 57 exs. 37-38 (Northern Trust Company records purporting to document that it held $45,139,000 in the Notes on behalf of thirty-seven clients on July 13, 2016).

      Plaintiffs are not obligated at this stage to identify each and every member of the putative class, *see, e.g.*, *Petrobras*, 862 F.3d at 266 n.16, but the shakiness of the individualized evidence of class membership that they have submitted and their failure to propose a method for reliably determining class membership on an administratively feasible (if not class-wide) basis persuade the Court that individualized questions regarding class membership would "overshadow" any common issues if a class were certified, *Hunter*, 2019 WL 3812063, at *17. Plaintiffs' evidence of class membership is riddled with gaps and peculiarities indicating that proving class membership will be an arduously fact-intensive task. For example, the only document that Plaintiffs have submitted that indicates the DTC participants who first divvied up the Notes—a DTC-generated report listing forty-four participants with positions in the Notes—does not

identify the participants by name but by a series of numbers that, absent a key or legend from DTC, is meaningless. *See* Dkt. 57 ex. 14. Plaintiffs purport to have identified thirty-three of the forty-four participants by sheer gruntwork, *see* Dkt. 56 (Mem. in Supp. of Class Cert.) at 7, but they have failed to identify the remaining eleven and, vitally for predominance purposes, offer no *methodology*—other than, it seems, even more gruntwork and paper-chasing—for doing so.

The evidentiary problems multiply as one moves to the next tier of the waterfall. As to those DTC participants that Plaintiffs purport to have identified, the evidence that the clients for whom those participants purchased the Notes were actually the beneficial owners of the Notes on July 15, 2016—and thus were members of the proposed class—is sketchy. One DTC participant, State Street Bank and Trust Company, provided Plaintiffs with a spreadsheet purporting to list the clients on whose behalf it purchased Notes and in what amounts. *See* Dkt. 57 ex. 47. But the spreadsheet is undated and unsupported by an affidavit or similar documentation indicating whether it reflects purported beneficial owners of the Notes on July 15, 2016, the only date relevant to the proposed class, or on some other date altogether. *Id.* Perhaps more important, the spreadsheet does not reflect whether the client entities listed were actually *beneficial owners* of the Notes rather than yet more banks, brokerage houses, or investment managers buying the Notes for others. *See id.* Indeed, one of the clients on the State Street spreadsheet is denominated "Confidential Client," giving the Court no sense whether that client is even in the category of entities—an individual investor, for instance—that one might expect to have been a genuine beneficial owner of the Notes and thus a member of the proposed class. *See id.*

Similar defects abound in Plaintiffs' evidence. *See, e.g.*, *id.* exs. 15 (purporting to reflect unspecified interest in Notes only on July 13, 2016); 19 (same); 38 (same); 35-36 (purporting to reflect unspecified interest in Notes only on July 13 and 14, 2016); 40-41 (same). One

document, from Morgan Stanley, certifies that the firm held some of the Notes on July 15, 2016, but it fails to identify the amount of Notes held and offers no indication whether Morgan Stanley was the beneficial owner of those Notes or, just as likely, had purchased them on some other entity's behalf. *See id.* ex. 34. And other documents seem to affirmatively suggest that at least some of the entities that Plaintiffs suggest are beneficial owners were, in fact, merely holding an interest in the Notes on behalf of yet further, unidentified, third-party clients. A spreadsheet from the Northern Trust Company, for instance, reflects that the Company held Notes on behalf of "ALERUS FINANCIAL – INV MGRS" in the amount of $10,000, *see* Dkt. 57 ex. 38, a relatively small amount that suggests that Alerus may have been holding those Notes on behalf of another entity or individual. If that is true, then Alerus Financial was not, contrary to Plaintiffs' contention, *see* Dkt. 56 (Mem. in Supp. of Class Cert.) at 7, a beneficial owner of the Notes and is, therefore, not a member of the proposed class. Other records similarly undercut Plaintiffs' theory that the clients for whom the forty-four DTC participants held Notes were necessarily beneficial owners of those Notes: the declarations from at least ten of those clients assert that they "owned" some interest in the Notes when they were redeemed on July 15, 2016, but they also disclose that they may have done so "on behalf of accounts managed by" them—that is, on behalf of other third parties further down the waterfall. *See* Dkt. 57 exs. 57, 58, 60, 61, 63-69. Determining the true beneficial owners of those Notes will be impossible without further, individualized proof, and Plaintiffs have failed to propose any means of obtaining, presenting, and adversarially testing that proof in a manner that will not overwhelm common questions. *See Hunter*, 2019 WL 3812063, at *12 ("Plaintiffs bear the burden of satisfying the Rule 23 requirements . . . including predominance. And . . . the predominance inquiry considers the means of determining membership in the proposed class. . . . Plaintiffs thus need to

demonstrate that common questions predominate over any individualized issues involved in determining class membership.").[4]

The Court describes these evidentiary problems at some length not to resolve whether Plaintiffs have proven the proposed class's membership at this stage but rather to explain why individualized questions concerning class membership will predominate over common questions. Although the evidence Plaintiffs have amassed is not quite the unmitigated disaster Defendants portray, *see* Dkt. 68 (Mem. in Opp. to Class Cert.) at 9-12, it is apparent that identifying the proposed class's members will not be the uncontested, ministerial, walk-in-the-park exercise Plaintiffs envision, *see* Dkt. 71 (Reply in Supp. of Class Cert.) at 4-5. It will instead be an individualized, fact-intensive process in which Plaintiffs' evidence of class membership will be subjected to bona fide adversarial scrutiny that will overwhelm the two common questions identified above. *See Hunter*, 2019 WL 3812063, at *14 (citing *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018) (finding predominance unsatisfied where "Court would reasonably expect" defendant's challenges to evidence of class membership "to be abundant"). Because the "complexity of determining class membership in this case makes clear that individual questions

---

[4] Plaintiffs characterize these evidentiary issues as mere "grumbles," *see* Dkt. 71 (Reply in Supp. of Class Cert.) at 4 n.7, but fail to address, let alone refute, them with any seriousness. As discussed, this Court is persuaded that the evidentiary idiosyncrasies Defendant has identified will, at the very least, draw legitimate adversarial scrutiny and require a factfinder to sift through mountains of individualized evidence. Even if Plaintiffs ultimately persuade the factfinder that Defendant's evidentiary "grumbles" are unfounded, the process of doing so will predominate over common questions.

The bulk of Plaintiffs' reply on this topic misses Defendant's argument: Defendant contends (meritoriously) that individualized questions regarding class membership will predominate over common questions; Plaintiffs respond by arguing that the proposed class does not present the ascertainability problems found in *Brecher*, *Royal Park*, and other cases. *See* Dkt. 71 (Reply in Supp. of Class Cert.) at 2-5. The Court agrees with Plaintiffs, *see supra* n.2, but their argument does not help them: even an ascertainable class cannot be certified if individualized questions concerning class membership predominate over common questions. *See, e.g.*, *Hunter*, 2019 WL 3812063, at *10 (noting that, after *Petrobras*, "difficulty in determining class membership is a factor considered under the predominance prong," not ascertainability); *Calvo*, 2018 WL 1633565, at *8 n.21 ("[T]he Second Circuit has recognized that administrative concerns regarding individual assessments of membership eligibility may be properly considered as part of a predominance analysis—rather than as a separate administrative feasibility assessment—and *not* that such concerns are irrelevant to class certification writ large."). That is, of course, exactly the situation here.

predominate over the common questions," Rule 23(b)(3) is not satisfied. *Calvo*, 2018 WL 1633565, at *9.[5]

Putting aside concerns over proving class membership, there is a second individualized question that threatens to predominate over common ones: whether any purported class members materially breached the Global Security by acquiring less than $250,000 in Notes and thereby excused Defendant's alleged breach of the Global Security with respect to those purported class members. The Global Security that governs the Notes provides that "[i]nterests in this security cannot be transferred, sold or otherwise disposed of in amounts of less than $250,000." Dkt. 57 ex. 3 at AB00038634. But Plaintiffs' evidence makes clear that a nonnegligible number of entities held or owned Notes in amounts significantly below that threshold. *See, e.g.*, Dkt. 57 ex. 25 (purporting to reflect individual beneficial ownership of $10,000 in Notes), 33 (purporting to reflect unspecified interest in $45,000 in Notes), 36 (purporting to reflect unspecified interests in $5,000, $10,000, $20,000, $45,000, and $50,000 in Notes). Indeed, it appears that five of the DTC participants who first purchased the Notes did so in amounts as small as $5,000. *See* Dkt. 57 ex. 14.

Resolving whether a purported class member's acquisition of Notes below the $250,000 minimum defeats liability as to that class member is likely to be an individualized question that predominates over common ones. "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the

---

[5] While the Court might be inclined to agree in the abstract that brokerage records would be straightforward proof of beneficial ownership, the inquiry is not so simple in this case because of the manner in which beneficial interests in the Notes were distributed. Plaintiffs had a year to conduct fact discovery, yet they were unable to follow the trail of money (the amounts paid to redeem the Notes) to uncover brokerage records, trading statements, or similar documents that conclusively and straightforwardly demonstrate beneficial ownership of the Notes. Having failed in this regard, and having failed to propose an administrable means of locating and processing the documents they say will conclusively prove the proposed class's membership, they cannot prop up their predominance arguments with a vague promise that class membership can be sorted out later during claims administration using brokerage or trading statements. *See* Dkt. 71 (Reply in Supp. of Class Cert.) at 4-5.

bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Id.* A variety of factors bear on the materiality analysis, including the "absolute and relative magnitude" of the breach, "its effect on the contract's purpose," and the "degree to which [the] injured party has benefited under [the] contract." *Id.* (citing *Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445 (N.Y. 1974)). Although the purpose of the Global Security's $250,000 minimum is not apparent, it appears that the breach of that minimum by some of the purported beneficial owners of the Notes was substantial in both absolute and relative terms; indeed, some entities held interests in the Notes as low as $5,000. *See, e.g.*, Dkt. 57 ex. 36 ($5,000), 25 ($10,000). Determining whether breaches of that magnitude were material and thus excused Defendant's obligations under the Global Security vis-à-vis those purported beneficial owners will, the Court anticipates, be an individualized and fact-intensive inquiry, requiring the factfinder to weigh the factors described in *Merrill Lynch* on a beneficial-owner-by-beneficial-owner basis to decide whether the size of each beneficial owner's interest in the Notes was sufficiently below $250,000 to constitute a material breach. This inquiry would overwhelm any common questions.

At this stage, the Court is not persuaded that Plaintiffs are correct when they assert that Defendant's material-breach defense will be susceptible to clean, class-wide resolution. Plaintiffs cite no authority for and barely explain their contention that the Global Security's prohibition on disposing of the Notes in amounts less than $250,000 "applies to the transferor, *not the transferee*," and thus, as a matter of law, does not apply to any purported class member. Dkt. 71 (Reply in Supp. of Class Cert.) at 10. The Global Security's text certainly does not

appear to contemplate any such limitation: "Interests in this security cannot be transferred, sold or otherwise disposed of in amounts of less than $250,000," Dkt. 57 ex. 3 (Global Security) at AB00038634.  Nor is the Court prepared to accept Plaintiffs' argument that a purported class member's breach of the $250,000 minimum interest in the Notes is immaterial as a matter of law, no matter the size of the breach.  *See* Dkt. 71 (Reply in Supp. of Class Cert.) at 10-11 ("Here, the object of the parties—to provide capital to AgriBank at a specified interest rate—was fulfilled regardless of what happened in the secondary market." (internal quotation marks omitted)).  The "absolute and relative magnitude" of a breach is one factor that bears on its materiality, and it must be weighed against, among other things, what the evidence reveals to be "the contract's purpose."  *Merrill Lynch*, 500 F.3d at 186 (citation omitted).  Under this rubric, a purported beneficial owner's acquisition of, for instance, $240,000 in Notes may not have been a material breach of the Global Security, but another purported owner's acquisition of $5,000 in Notes very well might.  The materiality inquiry will, therefore, be fact-sensitive, and given how widely the monetary value of purported class members' interests in the Notes apparently varied, the Court is not persuaded that this inquiry will not overwhelm common questions.[6]

The Court must also reject Plaintiffs' argument that because Defendant knew "that some DTC participants had Notes in amounts less than $250,000 . . . *prior to the Redemption,*" its material-breach defense fails as a matter of law and is therefore irrelevant to the predominance inquiry.  Dkt. 71 (Reply in Supp. of Class Cert.) at 11.  Even if that argument were factually and

---

[6] Plaintiffs' contentions that "neither Plaintiffs nor any other Class member [were] parties to the agreements at issue," that they "had no obligations under the [fiscal agency agreement] or the Global Security," and that they therefore "could not have committed any breach" of those documents, "much less a material one," Dkt. 71 (Reply in Supp. of Class Cert.) at 11 & n.20, are flabbergasting.  Plaintiffs are suing for breach of the Global Security and for breach of the implied covenant of good faith and fair dealing embedded therein.  *See* Dkt. 45 (Second Am. Compl.) ¶¶ 178-206.  If they were not parties to the Global Security or "had no obligations" under it, then they lack any right to sue Defendant for breaching the Global Security, *see, e.g.*, *Freeford Ltd. v. Pendleton*, 857 N.Y.S.2d 62, 67 (App. Div. 2008) ("[G]enerally only parties in privity of contract may enforce terms of the contract . . . .")—unless they were intended third-party beneficiaries of it, a theory they have never asserted.

legally correct, Defendant's material-breach defense would still be viable with respect to those beneficial owners who acquired less than $250,000 in Notes from DTC participants holding more than $250,000 in Notes. Northern Trust Company, for instance, appears to have held over $45,000,000 in Notes in DTC, but, as of July 13, 2016, two of its clients held interests in those Notes of only $10,000 and $100,000. *See* Dkt. 57 ex. 38. There is no evidence that Defendant knew when it redeemed the Notes that either of these Northern Trust Company clients held interests of less than $250,000, meaning that Defendant could not have waived its material-breach defense or been estopped from asserting it as against those clients by redeeming the Notes.[7] In any event, Plaintiffs' argument on this point cuts against class certification: if the viability of Defendant's material-breach defense ultimately turns on waiver, ratification, or estoppel, as Plaintiffs contend, then a factfinder will be forced to decide what Defendant knew, and when, and as to which class member that held less than $250,000 in Notes. This task will easily eclipse the two common questions identified above.

In sum, because the Court does not find that common questions predominate, as Rule 23(b)(3) requires, it must deny Plaintiffs' motion for class certification. And although the Court has discretion to modify the definition of the proposed class, *see, e.g.*, *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 153 (S.D.N.Y. 2017), it declines to do so here. Given the substantial gaps in the evidence of class membership that Plaintiffs have adduced so far, along with Plaintiffs' failure to offer an administrable and reliable means of filling those gaps, the Court concludes that there is no definable class for which individualized questions of class

---

[7] *See LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 463 (2d Cir. 1999) (Sotomayor, J.) ("[T]he criteria for application of affirmative defenses such as waiver and ratification are stringent. In order to establish that the Bondholders waived their objections to the Trustees' conduct, for example, the Trustees would have to demonstrate, among other things, that the Bondholders effected a deliberate, informed abandonment of known rights. . . . Similarly, to establish that the Bondholders ratified the Trustees' conduct, the Trustees would have to prove, among other things, that the Bondholders acted with full knowledge of all material facts relating to the transaction." (internal quotation marks and citations omitted)).

membership would not predominate. For the same reason, the Court's denial of class certification is with prejudice.

Finally, because the Court denies class certification with prejudice, it also denies Plaintiffs' motions to be appointed co-class representatives and to appoint Plaintiffs' counsel as class counsel.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for class certification, to appoint class representatives, and to appoint class counsel are DENIED with prejudice.

The parties must appear for a status conference on **October 18, 2019 at 10:00 A.M.** No later than **October 10, 2019**, the parties must submit a joint letter containing the following information in separate paragraphs:

a) a statement of all existing deadlines, due dates, and/or cut-off dates;

b) a brief description of any outstanding motions;

c) a statement describing the status of any settlement discussions and whether the parties would like to be referred to Magistrate Judge Fox for a settlement conference;

d) a statement of the anticipated length of trial and whether the case is to be tried to a jury;

e) a statement of whether any party anticipates filing a motion for summary judgment or a motion to exclude expert testimony and, if so, proposing a schedule for briefing such motions;

f) any other issue that the parties would like to address at the pretrial conference; and

g) any other information that the parties believe may assist the Court in advancing the case to settlement or trial.

The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 55.

**SO ORDERED.**

**Date: September 11, 2019**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**